UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| ALLAN PARMELEE, | ) | CASE NO. C05-2028-JLR |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| SANDRA CARTER, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## INTRODUCTION

Petitioner is a Washington state prisoner who is currently serving a 288-month sentence for two counts of first-degree arson. (Doc. #24, Ex. 1). In 1999, petitioner was found guilty, after a jury trial, of felony stalking and violating a court order prohibiting contact with his ex-wife. (Doc. #4). He has served the complete 60-month sentence for those convictions but now challenges that sentence, through the instant petition for a writ of habeas corpus, as having violated his Due Process rights because it was vindictive. After considering the briefs of the parties and the balance of the record, the court recommends that petitioner's habeas petition be denied with prejudice.

REPORT AND RECOMMENDATION
PAGE -1

## FACTS

The Washington Court of Appeals summarized the facts in petitioner's case as follows:

Renee Turner and Allan Parmelee married in 1994. They had one child, a son. After they married, Turner discovered that Parmelee corresponded by phone and mail with numerous incarcerated people.[1] Many of the letters were related to Parmelee's efforts to promote a book he had written on how to win a disciplinary hearing. Parmelee's correspondence with prisoners caused Turner great concern. He agreed with Turner that it would be dangerous for prisoners to know where they lived and said he would set up a post office box.

In April 1997, Turner filed for divorce. She also filed for a protection order against Parmelee, which she obtained for one year. Turner had legal counsel and Parmelee represented himself during the contentious divorce proceedings. After a trial, the dissolution was finalized in April 1998 and the court entered a permanent protection order. The child resided solely with Turner. Parmelee appealed the divorce.

While the dissolution appeal was pending, Turner received two envelopes in the mail containing some highly offensive printouts from a website that Parmelee had created. Turner contacted the police and they investigated. As a result, Parmelee was found guilty in Seattle Municipal Court for violating the protection order. The municipal court issued two no-contact orders, one on March 19, 1998, and the other on May 21, 1998, at the sentencing.[2] During the municipal court proceeding, Parmelee was incarcerated at the Federal Detention Center (FDC) in SeaTac on unrelated charges. Shortly after his conviction for violating the protection order, Turner began receiving letters from prisoners at the FDC. Turner "was scared to death. I was just traumatized, and it was awful." Turner suspected that Parmelee had asked prisoners to write to her at her home address; she did not know anyone else who was incarcerated.

Turner testified that the first letter she received "was a letter like if you wanted to be a pen pal." The inmate described himself and asked Turner to write him back and send a "sexy picture." Because Turner had never sought correspondence with any prisoners, "anything that was in the letter [she] considered to be offensive." The

---

[1] [Footnote in original] Before marrying Turner, Parmelee had been incarcerated in a federal prison in Illinois.

[2] [Footnote in original] The March 19 no-contact order expired on September 19, 1998, and the May 21 no-contact order expired on May 21, 2000.

REPORT AND RECOMMENDATION
PAGE -2

second letter Turner received was very graphic and described sexual acts that the prisoner wanted to perform with Turner. It also requested a "sexy picture" of Turner. Turner contacted the police, who instructed her not to handle any future correspondence. When Turner received a third letter, she handed it over to the police without opening it.

Turner took her son and left town in fear. Two more letters arrived which were collected by Turner's neighbor and turned over to the police. Turner returned after a month and changed the way her mail was delivered. Turner never read any of the letters after the second one. Each of the five letters was written by a different individual. Three of them eventually served as the bases for the court order violation charges at issue here.

The State initially charged Parmelee with one count of felony stalking and five counts of misdemeanor violation of a protection order. At trial, three of the prisoners who wrote letters testified: Randy Ness, Roger Hotrum, and Pedro Alcantar Gutierrez. Ness and Gutierrez were prisoners at the FDC; Hotrum was incarcerated in the Spokane County Jail. Of the three witnesses, only Gutierrez had written a letter that Turner had received and read.[3] Ness and Parmelee met in the law library at the FDC. Ness asked Parmelee if he knew of anyone he could write to, and Parmelee gave him Turner's name and address. Parmelee told Ness that Turner was his ex-wife, that she would send him photos, and that "she liked people that had been locked up." Ness also described a flyer that Parmelee had distributed to him and to others. The flyer read:

> Renee Turner, 2315 – 41st Avenue East, Seattle, Washington, 98112, age 48, height 5 foot 8, weight 135, hair red, dark, race white, recently divorced ex-husband in jail for long time, likes ex-cons, loves sex, wants men to come live with her, will send money if requested with photo, likes you to talk dirty to her, say you saw her ad in the prison magazine.

Ness testified that he sent Turner a friendly letter along with a prison picture of himself. A week later, police detectives visited Ness at the jail and he gave them a written statement. Ness later saw Parmelee, who wanted Ness to write Turner again. Parmelee told Ness he wanted to make Turner's life a "living hell" and asked Ness to pass around Turner's address to others. Ness did not write to Turner again.

Gutierrez also met Parmelee in the FDC library. Parmelee told him that he had a woman friend who likes Mexicans and asked if Gutierrez would like to write to her. Gutierrez agreed, and Parmelee gave Gutierrez Turner's address and three stamps.

---

[3] [Footnote in original] Gutierrez's letter was the second letter Turner received.

REPORT AND RECOMMENDATION
PAGE -3

Parmelee encouraged Gutierrez to write a "nasty" letter. With the help of another inmate, Gutierrez wrote a letter to Turner. A detective visited Gutierrez a week later. Gutierrez became angry that Parmelee had caused him to risk getting into trouble. He visited Parmelee and told him he was "going to kick his ass."

Hotrum was in the Spokane County Jail when another prisoner handed out some flyers soliciting letters to Turner. Hotrum wrote to Turner. He included personal information about himself. He also asked Turner to tell him more about herself and to send a picture.

Testimony and evidence at trial revealed that Parmelee had gone to great lengths to distribute the flyer among various prison populations. He asked Randy Keener, an FDC inmate who did work detail in the library, to make copies of the flyer. Keener testified that when he expressed reservations about making the copies, Parmelee said to him: "Everything [Turner] gets, she deserves," and "I hope someone rapes her, kills her, and she dies." Parmelee asked Keener to give the flyers "specifically to the blacks and the Mexicans." Parmelee also wrote to Mike Lee with "Raze the Walls" publishing. He enclosed one of the flyers and asked Lee to distribute it to as many prisoners as possible, but at least "the sex unit at Monroe.

*State v. Parmelee*, 108 Wash. App. 702, 704-07 (2001).

## PROCEDURAL HISTORY

The jury convicted petitioner of one count of felony stalking and three counts of misdemeanor violation of a court order. (*Id.*) The trial court sentenced petitioner to 12 months' imprisonment on each count, to run consecutively, for a total sentence of 48 months. The court also imposed a 5-year no-contact order. (*Id.*) Parmelee appealed the convictions and sentence.

The Washington Court of Appeals held that two of the convictions for violation of a court order had merged into the stalking conviction and therefore remanded the case for resentencing on the remaining single count of violating the no-contact order and the stalking count. (*Id.* at 711). At resentencing, the trial court, with a different judge presiding, sentenced petitioner to 48 months on the stalking count and 12 months on the no-contact count, to run consecutively, totaling 60 months' imprisonment. *State v. Parmelee*, 121 Wash. App. 707 (2004). The

REPORT AND RECOMMENDATION
PAGE -4

01 resentencing court also re-imposed the 5-year no-contact order. (*Id.*)

02 Petitioner appealed again to the Washington Court of Appeals, arguing that the second
03 sentence was the result of judicial vindictiveness – that, in effect, the second judge had punished
04 petitioner for having successfully appealed his first sentence by imposing a sentence 12 months
05 longer than the first. ( *Id.*) After applying the relevant law, the court of appeals disagreed and
06 affirmed petitioner's second sentence. (*Id.*) Petitioner sought review by the Washington Supreme
07 Court. The court denied review. (Doc. #18, Ex. 27).

08 On December 9, 2005, petitioner submitted the instant petition for a writ of habeas corpus
09 under 28 U.S.C. § 2254. (Doc. #4). Petitioner also moved for a stay of proceedings, claiming
10 that the law library where he was incarcerated was inadequate and hindered his ability to litigate
11 his habeas petition.[4] (Doc. #6). The court denied the motion for a stay, observing that, despite
12 his claim that the law library was inadequate, petitioner had been able to file a cognizable claim
13 and a memorandum to support it. (Doc. #9). The court suggested that petitioner file a motion
14 for an extension of time if he believed later that he needed more time to adequately litigate this
15 matter. (*Id.*)

16 Respondent filed her answer, followed by the state court record, on February 28, 2006.
17 (Doc. #15). Petitioner then moved for a 216-month (equivalent to 18 years) extension of time to
18 file a response to the answer, arguing that it would take that long for his prison law library to
19 supply him with the cases and statutes necessary to adequately respond to respondent's answer.
20 (Doc. #19). The court denied petitioner's motion because an 18-year extension of time was an

21 ─────────────────

22 [4] Petitioner is currently litigating this claim regarding the law library in another lawsuit pending in this district. *See Parmelee v. Carter, et al.*, Case No. C05-5646-RBL-KLS.

REPORT AND RECOMMENDATION
PAGE -5

01 absurd request, and ordered petitioner to show cause why he should not be barred from filing *any*

02 response as a sanction for wasting the court's time. (Doc. #20).

03     Petitioner appealed the court's Order to Show Cause to the Honorable James L. Robart,

04 the district judge assigned to this case. (Doc. #21). Judge Robart construed petitioner's appeal

05 as an objection under Fed. R. Civ. P. 72(a) and denied the objection. (Doc. #27). While the

06 objection was pending, petitioner filed what he termed a "partial response" to the answer. (Doc.

07 #24). He also filed a response to the court's Order to Show Cause, in which he contended that

08 he had not intended to waste the court's time with his motion seeking an 18-year extension of

09 time, but only to highlight his perceived lack of access to legal materials. (Doc. #22).

10     In light of petitioner's statement that he did not intend to waste the court's time, and the

11 lack of objection by respondent, the court resolved the sanction issue by permitting petitioner to

12 file the partial response to the answer. (Doc. #28). Respondent filed a reply to petitioner's

13 response on April 13, 2006. (Doc. #29). The matter is now ready for review.

14 GROUNDS FOR RELIEF

15     Petitioner sets forth a single ground for relief in his habeas petition:

16     1.    The sentence given by the trial court was vindictive because it was based on the exact same facts as the original sentence.

17

18 (Doc. #4 at 5).

19 DISCUSSION

20     <u>Standard of Review</u>

21     Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition may

22 be granted with respect to any claim adjudicated on the merits in state court only if the state

REPORT AND RECOMMENDATION
PAGE -6

court's adjudication is *contrary to*, or involved an *unreasonable application* of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d) (emphasis added).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* In addition, a habeas corpus petition may be granted if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)

In *Lockyer v. Andrade,* 538 U.S. 63 (2003), the Supreme Court examined the meaning of the phrase "unreasonable application of law" and corrected an earlier interpretation by the Ninth Circuit which had equated the term with the phrase "clear error." The Court explained:

> These two standards, however, are not the same. *The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness. It is not enough that a federal habeas court, in its "independent review of the legal question" is left with a "firm conviction" that the state court was "erroneous."* . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly**.** Rather, that application must be objectively unreasonable.

538 U.S. at 68-69 (emphasis added; citations omitted).

Thus, the Supreme Court has directed lower federal courts reviewing habeas petitions to be extremely deferential to decisions by state courts. A state court's decision may be overturned

REPORT AND RECOMMENDATION
PAGE -7

01 only if the application is "objectively unreasonable." 538 U.S. at 69.

02 <u>Petitioner's Sole Ground for Relief: Vindictive Resentencing</u>

03 Petitioner argues that his second sentence, which was 12 months longer than his first, was
04 "vindictive," and thereby violated due process under *North Carolina v. Pearce*, 395 U.S. 711
05 (1969), *limited by Alabama v. Smith*, 490 U.S. 794 (1989). Petitioner maintains that in imposing
06 a longer sentence, for half the number of counts that existed at his first sentencing, the
07 resentencing judge was impermissibly punishing petitioner for having successfully appealed his
08 original sentence. Petitioner also contends that the resentencing judge, the Honorable Gregory
09 Canova of King County Superior Court, was personally motivated to punish him because
10 petitioner had filed a complaint against Judge Canova with the Washington Commission on
11 Judicial Conduct. The complaint alleged that Judge Canova had had *ex parte* communications
12 with opposing counsel in an unrelated criminal matter involving petitioner in 2001. (Doc. #4 at
13 5, Ex. 2 at 2).

14 Respondent argues, in her answer, that the resentencing judge did not violate the rule
15 announced in *Pearce* because he "affirmatively stated" the reasons supporting a longer sentence.
16 (Doc. #15 at 17). *See Pearce*, 395 U.S. at 726. Respondent also asserts that, in any event,
17 petitioner's claim is now moot because he has already served the complete 60-month sentence and
18 the court cannot effectively grant him any relief. (*Id*. at 17-18). The court need not address the
19 mootness issue because, as discussed below, petitioner has failed to carry his burden of showing
20 that the court of appeals' decision rejecting his claim under *Pearce* was either contrary to, or a
21 misapplication of, clearly established federal law.

22

REPORT AND RECOMMENDATION
PAGE -8

When a sentencing court imposes a more severe sentence on remand, the reasons for the court "doing so must affirmatively appear." *Alabama v. Smith,* 490 U.S. 794, 798 (1989) (citation and internal quotation marks omitted). "Otherwise, a presumption arises that a greater sentence has been imposed for a vindictive purpose – a presumption that must be rebutted by objective information . . . justifying the increased sentence." *Id.* at 798-99 (citation and internal quotation marks omitted).

However, the presumption of vindictiveness does not "apply in every case where a convicted defendant receives a higher sentence on retrial." *Id.* at 799 (citation and internal quotation marks omitted). Indeed, the presumption of vindictiveness is not designed to prevent the imposition of an increased sentence "for some valid reason associated with the need for flexibility and discretion in the sentencing process," but is "premised on the apparent need to guard against vindictiveness in the resentencing process." *Chaffin v. Stynchcombe,* 412 U.S. 17 (1973). The presumption applies only where there exists a "reasonable likelihood . . . that the increase in sentence is the product of actual vindictiveness," and "[w]here there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness." *Smith,* 490 U.S. at 799-800 (citation and internal quotation marks omitted).

Here, petitioner contends that Judge Canova's resentencing was presumptively vindictive because (1) the second sentence was 12 months longer than the original, but was based upon the exact same facts as the original;[5] and (2) the judge was personally motivated to punish petitioner

---

[5] Respondent inexplicably asserts, in her reply to petitioner's response, that the overall length of petitioner's second sentence "was not greater than the original sentence." (Doc. #29 at 2). This statement, however, is belied by the state court record submitted by respondent. (Doc. #18, Ex. 1 & 2).

REPORT AND RECOMMENDATION
PAGE -9

because petitioner had filed a complaint against him. The latter reason should be summarily rejected because it does not appear that petitioner raised this argument in the state court. Indeed, the court of appeals commented that "Parmelee acknowledges that the resentencing judge did *not* have a personal basis for vindictive sentencing . . . ." *State v. Parmelee*, 121 Wash. App. 707, 712 n.2 (2004) (emphasis added).[6]

Petitioner's first contention also fails because he cites no Supreme Court authority that holds specifically that a resentencing based on identical facts as the original sentence is per se vindictive. To be sure, had the *same* judge resentenced petitioner here to a longer sentence, a presumption of vindictiveness would likely arise. But a *different* judge resentenced petitioner after he had successfully appealed the original sentence. In *Texas v. McCullough*, 475 U.S. 134 (1986), the Supreme Court refused to apply the presumption of vindictiveness when, after a retrial, a judge imposed a harsher sentence than had been originally imposed by a jury. The Court commented that "[u]nlike the judge who has been reversed," a second judge who resentences has "no motivation to engage in self-vindication." *Id.* at 139 (internal quotation marks and citation omitted). When, as here, two different sentencers are involved, the Court observed that "[i]t may often be that the [second sentencer] will impose a punishment more severe than that received from the [first]. But it no more follows that such a sentence is a vindictive penalty for seeking a [new] trial than that the [first sentencer] imposed a lenient penalty." *Id.* at 140 (internal quotation marks

---

[6] The basis for this observation by the court appears to be petitioner's admission, in his reply brief to the court of appeals, that "it is true that Judge Canova would have no personal motive for self-vindication . . . ." (Doc. #18, Ex. 24 at 3).

REPORT AND RECOMMENDATION
PAGE -10

and citation omitted; alteration in original).[7]

In addition to the fact that petitioner was resentenced by a different judge, the presumption should not apply here because Judge Canova affirmatively stated "wholly logical, nonvindictive" reasons for the sentence. *McCullough*, 475 U.S. at 140. He explicitly found that four factors warranted the imposition of an exceptional sentence: deliberate cruelty, invasion of the victim's privacy, a high level of sophistication and planning, and the offense was more egregious than the typical offense. Judge Canova detailed his basis for finding these factors both orally at the sentencing hearing (Doc. #18, Ex. 20) and in writing afterwards. (*Id.*, Ex. 21). Petitioner does not show, nor could he, that Judge Canova's reasons do not meet the standard under *Pearce* as being wholly logical and nonvindictive. *See McCullough*, 475 U.S. at 140 ("We read *Pearce* to require no more, particularly since trial judges must be accorded broad discretion in sentencing.").

Thus, petitioner fails to carry his burden of showing that the Washington Court of Appeals' decision rejecting his claim of vindictive resentencing was either contrary to, or a misapplication

---

[7] Petitioner relies upon two 9th Circuit cases which he contends support his position, *United States v. Peyton*, 353 F.3d 1080 (9th Cir. 2003) and *Nulph v. Cook*, 333 F.3d 102 (9th Cir. 2003). However, petitioner's lengthy quote from *Peyton* (Doc. #5 at 6-7) merely restates the doctrine of *Pearce* and its progeny, summarized *supra* at 8, and his reliance on *Nulph* is misplaced. It is true that *Nulph* states that "the presumption applies. . . even though [a different judge] may have presided over the case on remand." *See* 333 F.3d at 1058, *citing Fenner v. U.S. Parole Comm'n*, 251 F.3d 782, 788 (9th Cir. 2001). But this statement should not be given weight because (a) *Fenner* does not actually appear to support that proposition; and (b) even if it did, both cases are circuit court decisions and habeas relief can be based solely upon violation of "clearly established Federal law, *as determined by the Supreme Court* . . . ." 28 U.S.C. § 2254(d)(1) (emphasis added). Moreover, the court notes that *Nulph* was not a typical habeas case because, as the Ninth Circuit commented therein, the highly deferential standard that normally applies to habeas cases did not apply because "the state court did not reach the merits of Nulph's due process claim." 333 F.3d at 1056. Instead, the Ninth Circuit applied a de novo standard of review to Nulph's claim. *Id.* at 1057.

of, clearly established federal law.  Therefore, his sole ground for relief should be denied.

## CONCLUSION

For the foregoing reasons, petitioner's petition for a writ of habeas corpus should be denied with prejudice.  A proposed Order reflecting this recommendation is attached.

DATED this 24th day of April, 2006.

_____
Mary Alice Theiler
United States Magistrate Judge